## CONTINUATION IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Joshua White, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1.      Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically, 21 U.S.C. § 841(a)(1), distribution or possession with intent to distribute a controlled substance, and 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm (hereinafter referred to as the "Target Offenses"), will be found in the locations listed in **Attachment A**.  The categories of items to be seized are described in **Attachment B**.

2.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and I have served as such since July 2022. Prior to serving as an ATF Special Agent, I was employed by the United States Secret Service as a Uniformed Division Officer for three and a half years. My daily responsibilities while serving were to screen passholders and appointments who had access to the White House Grounds, assist with protectee movements onto and off of the White House Complex, and enforce D.C. Code as well as Federal Law. I have completed the Federal Law Enforcement Training Center (FLETC) Uniformed Police Training program (UPTP) and the Criminal Investigator Training Program (CITP) with a total combination of over 800 hours of classroom and practical training. I have completed ATF's Special Agent Basic Training (SABT) academy with over 500 hours of classroom and practical training. I am presently assigned to ATF's Lansing Office conducting narcotics/firearms investigations.

3.      The facts in this affidavit come from my personal observations, training, experience, and information obtained from other witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.       I am currently investigating Nathanael WILSON (XX-XX-1977).  Based on the facts set forth in this affidavit, there is probable cause to believe that evidence indicating that WILSON committed the Target Offenses will be located at 5087 W Centerline Road, St. Johns, Michigan 48879 (hereinafter referred to as the "Target Residence"), its outbuildings, and curtilage; any vehicles registered to WILSON on the curtilage; on the person of Nathanael WILSON; and on cellular or mobile telephones or devices owned by or associated with WILSON.

## PROBABLE CAUSE

5.       Upon review of WILSON's criminal history, I located the following felony convictions for WILSON:

a.       02/01/2016: 29th Circuit Court of Michigan – Felony Controlled Substance – Operating/Maintaining a Laboratory in Presence of a Minor.

b.       07/19/2021: 29th Circuit Court of Michigan – Felony Police Officer – Assaulting/Resisting/Obstructing.

c.       2021 – 29th Circuit Court of Michigan– Felony Criminal Sexual Conduct – 3rd degree (Person 13-15).

6.       On May 9, 2024, SA White spoke with the Clinton County Sheriff's Office regarding WILSON and his association with the Target Residence. Investigators from the Clinton County Sheriff's Office advised that they knew the Target Residence belonged to WILSON and that he was a part of a previous narcotics investigation. In fact, I was advised that they responded to a residential structure fire that was believed to be caused by the manufacture of methamphetamine. WILSON pled guilty to Operating and Maintaining a Laboratory in the Presence of a Minor in the 29th Circuit Court of Michigan (CFN: 15-009526-FH).

Confidential Informant Information

7.          In February of 2024, SA Joshua White and TFO Trevor Arnold had contact with ATF CI 32207 regarding WILSON. [1] CI 32207 is known to me, but I have not provided identifying information in this warrant.   CI 32207 has previously provided reliable information to the government and other law enforcement agencies regarding multiple suspects that have been corroborated and used to support probable cause in multiple state search warrant applications and have resulted in the seizure of narcotics. I have found CI 32207 to be truthful and reliable.

8.          CI 32207 advised that WILSON sells methamphetamine and distributes narcotics while armed with a firearm. CI 32207 has seen WILSON with a firearm on multiple occasions. CI 32207 also advised that WILSON is a convicted felon. CI 32207 reported that WILSON's phone number is 616-308-1500 and that WILSON drives a white Chevy Express van, a red Ford F-150, and a white Toyota Corolla with Michigan license plate CMD258, which is registered to WILSON's wife. CI 32207 has seen WILSON with at least six firearms. CI 32207 identified the Target Residence as WILSON's residence.

First Controlled Purchase – the Fourth Week in April 2024

9.          During the fourth week in April 2024, investigators began preparing for a controlled purchase of narcotics from WILSON.  Directly prior to the controlled purchase, Lansing Police Department Officer Zolnai established roaming surveillance on 4512 W Centerline Road, St. Johns, MI.

10.         Prior to the controlled purchase, at SA White's direction, CI 32207 text messaged WILSON at cell phone number 616-308-1500. CI 32207 text messaged WILSON

---

[1] CI 32207 is cooperating with law enforcement for financial gain.

setting up the controlled purchase of methamphetamine in exchange for $80.00 of prerecorded government funds. WILSON wrote in a text message, "Hurry up I'm out of gas at the new farm."

11.    Prior to the controlled purchase, SA Mascorro, SA White, and an undercover Lansing Police Department Officer (hereinafter referred to as "UC") met with CI 32207 at a pre-determined meet location. SA White, in the presence of UC, searched CI 32207's person for currency and contraband with negative results, provided CI 32207 with electronic recording equipment, and provided CI 32207 with prerecorded government funds.

12.    At approximately 5:45 p.m., prior to the controlled purchase taking place, WILSON called CI 32207 and confirmed that CI 32207 was still coming. [This contact was made in the presence of the UC and was made unexpectedly].

13.    Prior to the controlled purchase, at SA White's direction, CI 32207 placed a recorded telephone call to WILSON at 616-308-1500. During this call CI 32207 advised WILSON that he was still on his way and asked WILSON if it was alright if he still stopped by. WILSON responded, "yeah, yeah, I'm here."

14.    At approximately 6:11 p.m., CI 32207 and the UC departed the predetermined meet location in the UC vehicle with the UC as the driver and CI 32207 as the front seat passenger.

15.    At approximately 6:15 p.m., the UC and CI 32207 arrived at 4512 W Centerline, and CI 32207 exited the vehicle. The controlled purchase took place between approximately 6:15 p.m., and 6:27 p.m.

16.    During the controlled purchase, the UC observed WILSON standing in the driveway of 4512 W Centerline. Once the UC and CI 32207 arrived, CI 32207 exited the UC vehicle and walked to the back of the property with WILSON. During this time, the UC observed

a white sedan bearing license plate CMD258. Approximately 12 minutes later, CI 32207 and WILSON returned to the area where the UC vehicle was parked.

17.      At approximately 6:27 p.m., CI 32207 and the UC departed from the area of 4512 W Centerline and subsequently met SA Mascorro and SA White at a predetermined location.

18.      CI 32207 was accompanied by the UC from the purchase location back to the predetermined meet location. Immediately after the controlled purchase CI 32207 gave the UC one plastic container filled with suspected methamphetamine and the electronic recording equipment. The UC then provided these to SA White. SA White searched CI 32207 for currency and contraband with negative results. SA Mascorro and SA White then met with CI 32207. CI 32207 provided the following information regarding the controlled purchase of suspected methamphetamine:

      a.  CI 32207 met with WILSON at 4512 W Centerline Rd St. Johns, MI.

      b.  WILSON provided CI 32207 with the suspected methamphetamine in exchange for $80.00 in prerecorded government funds.

      c.  WILSON retrieved the methamphetamine from a red dodge vehicle where CI 32207 also observed additional methamphetamine being stored.

      d.  CI 32207 observed WILSON had a pistol inside of his boot during the controlled purchase. CI 32207 also observed a rifle inside of the garage on a cabinet.

19.      Upon return to the LPD Operations Center, the knotted plastic container containing the suspected methamphetamine was field tested. The substance tested positive for the presence of methamphetamine.

CI 32207 Contact – First Week of May 2024

20.    During the first week in May 2024, CI 32207 was at the Target Residence, and sent SA White a picture of a firearm and suspected serial number, which he took at the Target Residence. WILSON was at the Target Residence.

Surveillance of Target Residence – Second Week of May 2024

21.    During the first week in May 2024, at approximately 2:44 p.m., SA White and SA Hurt conducted drive-by surveillance at the Target Residence and observed multiple vehicles and a white male matching the description of WILSON outside of the Target Residence.

Attempted Controlled Purchase – Second Week of May 2024

22.    Prior to the controlled purchase taking place, CI 32207 had unrecorded telephone contact with WILSON at 616-308-1500. During this contact, CI 32207 set up deal to purchase $80.00 worth of methamphetamine from WILSON at the Target Residence.

23.    Prior to the controlled purchase, SA Mascorro and SA White met with CI 32207 at a pre-determined meet location. SA White, in the presence of SA Mascorro, searched CI 32207's person and vehicle for currency and contraband with negative results, provided CI 32207 with electronic recording equipment, and provided CI 32207 with prerecorded government funds.

24.    At approximately 3:00 p.m., CI 32207 departed the predetermined meet location in the UC vehicle with CI 32207 as the driver and only occupant of the vehicle. SA Mascorro and SA White surveilled CI 32207 from the pre-determined meet location to the Target Residence. CI 32207 then exited his vehicle and met with WILSON.  The attempted controlled purchase took place between approximately 3:08 p.m., and 3:56 p.m.

25.    The controlled purchase did not occur, and the deal was canceled. At approximately 3:56 p.m., CI 32207 departed the area of the Target Residence and subsequently met SA Mascorro and SA White at a predetermined location.

26.    CI 32207 provided the following information regarding the attempted controlled purchase of methamphetamine from WILSON at the Target Residence:

    i.    CI 32207 met with WILSON at the Target Residence.

    ii.    CI 32207 saw a jar filled with suspected methamphetamine inside the Target Residence.

    iii.    CI 32207 was at the Target Residence on 5-6-24 and saw methamphetamine. WILSON was present at this time.

    iv.    WILSON was at the Target Residence with his wife.

    v.    WILSON had methamphetamine in his hand and then put it in his pocket.

Additional Information

27.    Based on my training and experience, participation in numerous firearm and controlled substance investigations, and based upon information from veteran law enforcement officers, I know:

    a.    Drug traffickers commonly conduct financial transactions in cash to avoid documentation of their purchases and expenditures, thus making it more difficult for law enforcement to identify these transactions.

    b.    Drug traffickers often maintain, on hand, sufficient amounts of U.S. currency to maintain and finance their ongoing narcotics business, as well as for the purposes of funding their daily living expenses and purchases.

c.  Drug traffickers often maintain books, records, receipts, notes, ledgers, money orders, and other documentation relating to the transportation, ordering, sale, and distribution of controlled substances.  The above items are generally maintained in locations to which the drug traffickers have frequent and ready access (i.e., in their residences and vehicles), including electronically on computers or cellular phones.

d.  Drug traffickers often maintain the means and instrumentalities utilized in the possession, dilution, or distribution of narcotics in their vehicle and/or residence.

e.  Drug traffickers often use cellular devices or mobile telephones to facilitate the purchase and sale of illegal drugs.  Cellular or mobile telephones or devices are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so narcotics traffickers use the devices in an effort to avoid detection by law enforcement.  Cellular devices often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls and text messages with suppliers and purchasers of narcotics; voicemail messages; photographs of drugs, firearms, coconspirators, or currency; customer and supplier contact information; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high drug trafficking areas or evidencing the route used in trafficking narcotics.  Additionally, drug traffickers typically maintain and use multiple cellular devices, often in the names of nominees, to facilitate sales, and frequently switch phones to evade detection by law enforcement.  Further, these types of devices are used to access social media websites, including Facebook and Instagram.  I know that drug traffickers use social media with increasing frequency to communicate with suppliers and purchasers of narcotics. I know

that these devices are often carried on their person, located in their vehicle or in their residence.

f.  It is common for drug traffickers to take and maintain photographs of themselves and their colleagues with drugs, using drugs, and with firearms and cash displayed as the tools and proceeds of their illegal drug distribution, and to keep either physical or electronic copies of those images.  The images are often stored on smart phones, computers, and other digital devices, as well as on social media websites and accessed via computers and cellular devices.  Digital evidence can be found for a long period of time on computers, cellular phones, and other devices because a forensic examiner can access even temporary and deleted files, as well as internet history, long after they are accessed or created by the user.

g.  It is common for drug traffickers to store proceeds of drug sales and records of drug transactions in secure locations within their residences for ready access and to conceal them from law enforcement.  Proceeds include, but are not limited to, cash, electronics, and other high-value items.

h.  Also, it is common for drug traffickers to keep firearms and related materials—such as ammunition and magazines—to protect their narcotics and narcotics proceeds.  It is also common for drug dealers who sell narcotics out of their residence to maintain firearms there in order to protect themselves, their drugs, and their proceeds from customers who attempt to rob them.  I also know, based on my training and experience, that individuals who possess firearms often maintain possession of them for extended periods of time.  I am aware that individuals who possess firearms also possess other items associated with their firearms including ammunition, magazines, holsters, cases, and records indicating purchase, use, maintenance, or sale of such items.

i.   Illegal firearms users and traffickers use mobile telephones to facilitate the purchase and sale of illegal firearms.  Mobile phones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so firearms traffickers use the devices in an effort to avoid detection by law enforcement.   Mobile phones often contain evidence indicative of illegal firearms possession and trafficking, including records of incoming and outgoing calls and text messages with suppliers and purchasers of firearms; voicemail messages; photographs of firearms, coconspirators, or currency; customer and supplier contact information; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high crime areas or evidencing the route used in trafficking illegal firearms.  Additionally, illegal firearms traffickers typically maintain and use multiple mobile phones, often in the names of nominees, to facilitate sales, and frequently switch phones to evade detection by law enforcement.

j.   Based on the above, as well as the evidence we have that WILSON communicates by phone about narcotics transactions, there is probable cause to believe that evidence of his selling or possessing controlled substances/firearms would be found on cellular phones or devices owned by or associated with WILSON.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.      Based on my knowledge, training, and experience, I know that electronic devices (including cellular or mobile telephones or devices) can store information for long periods of time. Similarly, things that have been viewed via the Internet (including on cellular or mobile telephones

or devices) are typically stored for some time on the device.  This information can sometimes be recovered with forensics tools.

29.    *Forensic evidence.*  As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on WILSON's cellular or mobile telephone or device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" for a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a

computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30.    *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium or device, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31.    Based on the aforementioned facts, I submit there is probable cause to believe that the locations described in **Attachment A** contain evidence and/or fruits of crimes, as further described in **Attachment B**, specifically relating to violations of the Target Offenses in Clinton County, in the Western Judicial District of Michigan.